# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 23, 2021 Session

## STATE OF TENNESSEE v. DEMONTEZ D. WATKINS

**Appeal from the Criminal Court for Davidson County**
**No. 2017-C-1811    Cheryl A. Blackburn, Judge**

_____

### No. M2020-00035-CCA-R3-CD

_____

The Defendant, Demontez D. Watkins, was convicted by a Davidson County Criminal Court jury of first degree felony murder; two counts of attempted first degree premeditated murder, a Class A felony; second degree murder, a Class A felony; attempted especially aggravated robbery, a Class B felony; and two counts of employing a firearm in the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-13-202(a)(2) (2018) (first degree murder), 39-13-210 (2014) (subsequently amended) (second degree murder); 39-13-403 (2018) (especially aggravated robbery); 39-17-1324(b)(1), (2) (2018) (employing a firearm during the commission of a dangerous felony); 39-12-101 (2018) (criminal attempt). The trial court merged the first degree felony murder and second degree murder convictions and imposed an effective sentence of life plus twenty-seven years. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions, (2) the trial court erred in admitting expert testimony regarding probabilistic genotyping regarding DNA evidence, (3) the court erred in denying his motion to suppress his pretrial statement, (4) the court erred in admitting evidence because the chain of custody was not adequately shown, and (5) the court erred in imposing consecutive sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Martesha L. Johnson, District Public Defender; Jeffrey A. DeVasher (on appeal), Patrick Hakes (at trial and on appeal), Kristin Neff (at trial), and Jessica Dragonetti (at trial), Assistant District Public Defenders, for the Appellant, Demontez D. Watkins.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn R. Funk, District Attorney General; Doug Thurman and David

Orlando Jones, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to the homicide and attempted especially aggravated robbery of Reginald Ford, Sr.[1] and other offenses occurring contemporaneously. The Defendant was indicted with codefendants Davonta Jewan Sherrill, Rolandus Latraye Denzmore, and Troyvonte Deshawn Watkins, but the Defendant was tried separately.

At the trial, Cheressa Miller, the victim's wife, testified that she and the victim lived with their children in a duplex. She said the victim had two children from other relationships. She said that on the night of August 5, 2015, the victim had been at work and that she expected him to come home after work. She said she heard banging noises around midnight. She said her son ran into the room and said the victim had been shot. She said she went outside to the victim, who was lying on his back with his right foot in his car and who had been shot in the head. She said she administered CPR and called the police. She said that the victim was not known to carry a gun and that she did not think he had a gun that night.

Linnea Harris testified that she and the victim had a child together and that she saw the victim on the night of August 5, 2015. She said that after they were together, they had a telephone conversation and that she knew he reached his house because she heard his car door open and dinging sounds. She said that during their conversation, the victim suddenly said, "I ain't got nothing, I ain't got nothing." She said he sounded panicked. She did not hear other voices or any threats in the background. She said she heard gunshots ten to twelve seconds later. She said she called the victim's cousin, Tony, and 9-1-1.

Ms. Harris testified she had never heard the names of the Defendant or the codefendants in her conversations with the victim.

Demetria Lavender testified that in August 2015, she lived in the duplex which was part of same building where the victim and his family lived. She said she lived with Derek Mitchell, who was her husband, and their three children. She said her seven-year-old child and her thirteen-year-old child were asleep in a bedroom which had a window facing a parking lot. She said her husband woke her about an hour after she went to bed and asked if she had heard a noise that sounded like gunshots. She said her husband activated their home alarm system and that she heard Ms. Miller screaming outside. Ms. Lavender said she noticed bullet holes in the curtains, dresser, headboard, a pillow, and

---

[1] We will refer to Mr. Ford as "the victim." We intend no disrespect to the other individuals who were the victims of the attempted first degree premeditated murder convictions.

-2-

walls of the bedroom in which the seven-year old and the thirteen-year old had been sleeping. She said hallway walls, the kitchen, and the laundry room door were also damaged by the gunfire. Photographs of the damage in the bedroom were received as exhibits.

Metropolitan Nashville Police Department (MNPD) Officer Chase Burnett testified that he was dispatched to the victim's address around 12:05 a.m. on August 6, 2015. He said that when he arrived, he saw the victim lying on his back on the ground with one leg "hanging out of a maroon Dodge Charger." Officer Burnett recognized the victim as a civilian employee of the Davidson County Sheriff's Department. Officer Burnett said the victim had a gunshot wound to the head and was not breathing or conscious. He said that he and other officers found about nine shell casings about twenty feet from the victim's body. He identified photographs of the area where the shell casings were found, and the photographs were received as exhibits. He agreed that he did not state in his report that the victim's pockets had been "turned out."

MNPD Crime Laboratory forensic scientist Christina Dradt testified that she went to the scene around 1:30 a.m. on August 6, 2015. She said she collected evidence and prepared a diagram of the scene. The diagram was received as an exhibit. She said that four cars were in a parking lot, that fourteen nine-millimeter bullet cartridge casings were found behind a red Mustang near an alley, that another car had two bullet "strike marks," and that a bullet projectile was lodged in a building's exterior wall. She said the victim lay face-up on the driver's side of a car with his right leg partially inside the car. She said Officer McClendon photographed the scene, and she identified evidentiary items depicted in the photographs. She said hair found at the scene was in a braid or dreadlock style. Ms. Dradt said she went inside the residence, where she observed evidence of gunfire.

MNPD crime scene investigator Justin Cregan testified that he went to the scene on August 6, 2015, where he saw a "couple" of cars in the parking lot. He said the victim was on the driver's side of one of the cars. He said the victim's car and the fascia of the house contained bullet strikes. The house's window facing the parking lot had bullet holes. Inside the residence, which other evidence showed to be Ms. Lavender's, Investigator Cregan observed two bullet projectiles, which were collected as evidence.

Metropolitan Nashville and Davidson County Medical Examiner Feng Li, M.D., an expert in forensic biology, testified that he performed the autopsy of the victim's body. Dr. Li stated that a bullet entered the victim's body at the left earlobe; traveled into the ear canal, brain, and cerebellum; and did not exit the victim's head. Dr. Li identified two bullet fragments that were recovered from the victim's head. Dr. Li said the victim had a "powder tattoo" on the victim's head, which was caused by a gunshot burying gunpowder in human skin, which caused Dr. Li to conclude that the victim had suffered an intermediate range gunshot wound. Dr. Li said he wore gloves when he removed the victim's clothing. Dr.

Li's report was received as an exhibit and reflected that the victim's cause of death was a "gunshot wound of the head" and that the manner of death was homicide.

MNPD Crime Laboratory employee Donald Carman, an expert in firearms and toolmark identification, testified that he examined evidentiary items collected in this case, which included a fired metal bullet jacket, fourteen fired nine-millimeter cartridge casings, several bullet fragments, and two nine-millimeter bullets. He said bullet fragments recovered by the medical examiner were .40 caliber. He said that all of the nine-millimeter cartridge casings had been fired from the same gun and noted that the bullets had been made by two different manufacturers. He said the firing pin impressions on the casings were consistent with their having been fired from a gun manufactured by Glock. He said the .40-caliber bullet fragments recovered by the medical examiner had markings which were consistent with the bullet having been fired from a Smith & Wesson gun.

MNPD Crime Laboratory DNA Analyst Julie Ellis, an expert in forensic serology and DNA analysis, testified that she received the Defendant's buccal swab containing his DNA, a sample of the victim's blood, and the victim's pants. Ms. Ellis stated that both front pockets and the back right pocket were "partially pulled out." She said she swabbed the inside of the right front pocket to collect DNA evidence. She said that after analysis of the items by another individual in the laboratory, she prepared a disc containing data related to the samples and the analysis.

Ms. Ellis testified that trace DNA referred to DNA evidence which was sometimes created when a person had limited contact with a surface. She said that trace DNA evidence might remain on a surface for a year. She said it was possible for a person to leave trace DNA evidence on clothing. She said DNA secondary transfer may occur when a person touches an object previously touched by another person, whereby the first person's DNA is transferred upon the second person's contact with the object. She said that the crime laboratory was accredited and that its analysts underwent proficiency testing to ensure that they followed procedures and performed their analysis correctly. She said laboratory documentation showed that the proper procedures were followed in the present case.

Ms. Ellis testified that she never received known DNA profiles for the codefendants.

MNPD Crime Laboratory employee Benjamin DeBlanc, an expert in forensic DNA analysis, testified that every person, other than identical twins, had unique DNA. Relative to the present case, he said he developed DNA profiles from the samples collected from the Defendant and the victim. Mr. DeBlanc said he analyzed a sample from the victim's pants pocket and concluded that it was a mixture from at least four individuals and that it was too complex for the Metro laboratory to determine the identity of any single contributor. He said that another person in the laboratory reviewed his analysis and reached the same conclusions. Mr. DeBlanc testified that the complexity of the mathematics

involved in DNA comparisons from a sample of four or more contributors was too complex for human calculations and that he recommended that Investigator Frank contact Cybergenetics, a company that could complete the analysis using probabilistic genotyping computer technology.

Jennifer Hornyak, a Cybergenetics employee and expert in forensic DNA and probabilistic genotyping, testified that her employer was a biotechnology company that developed "computer systems that interpret DNA." She said the company was privately owned and worked with both prosecutors and defense attorneys.

Ms. Hornyak testified that Cybergenetics had developed TrueAllele software, which was used for forensic DNA analysis. She said TrueAllele was first used in a criminal case in 2009 and that "TrueAllele results have been produced in forty-three states as well as federal and foreign courts." She said TrueAllele had been used to help identify remains of 2700 victims in the World Trade Center attack.

Ms. Hornyak testified that TrueAllele was based upon mathematical probabilities that had been "around since the late 1700s" and statistical computing that had "been around since about the 1950s," and that the two had been applied in combination to forensic DNA analysis for about ten years. She said that a human "can only look at so much before [forensic DNA analysis] gets too complex" and that computers were capable of more complex analysis. She said the ability of TrueAllele software to analyze DNA and DNA mixtures had been tested in thirty-six validation studies, seven of which had been peer reviewed and published in journals. She said one validation study showed the software's reliability for mixtures containing the DNA of up to ten unknown contributors. She said a validity study examined the error rate and reliability of the subject of the study. She said eight crime laboratories currently used TrueAllele software in their regular casework. She thought about seven laboratories used the software at the time of the analysis conducted in the present case. She said other probabilistic genotyping software products existed and did not know Cybergenetics' market share.

Ms. Hornyak testified that MNPD Detective Jason Frank contacted Cybergenetics to perform DNA analysis relative to this case. Using a visual presentation, she explained the process of DNA analysis. She said that the evidence submitted by Detective Frank was analyzed in twenty-two DNA locations for matches against known samples. She said TrueAllele analyzed the peaks in the data from the DNA mixture collected from the victim's pants pocket to determine the number of contributors and the DNA profile for each. She said TrueAllele analyzed hundreds of thousands of possibilities to determine the best explanation for the DNA profiles of the individual contributors to the DNA mixture. She said that during this stage of the analysis, the DNA profiles of the known individuals were not entered into TrueAllele. Thus, TrueAllele completed this portion of the analysis without information regarding the DNA profiles of known individuals. She said the DNA

profiles of the known individuals were later input into TrueAllele for comparison with the DNA profiles identified in the TrueAllele analysis of the DNA mixture.

Ms. Hornyak testified that TrueAllele analysis showed that a match between the DNA mixture from the pants and the Defendant's DNA profile was 470,000 times more probable than a coincidental match to an unrelated African-American male and that the error rate for the Defendant's DNA being a match was one in 6.1 million. In other words, the odds of the DNA from the mixture identified as the Defendant's belonging to another person was one in 6.1 million. She said a match between the DNA from the mixture from the pants and the victim's DNA profile was 204 trillion times more probable than coincidence. Ms. Hornyak said her report was reviewed by three other analysts, one of whom was Dr. Mark Perlin, the chief scientific officer of Cybergenetics. She said Cybergenetics did not receive known DNA profiles for anyone other than the Defendant and the victim.

William Watson, Ph.D., a defense witness called out of order and an expert in DNA forensic analysis, testified that he had training and experience with TrueAllele software from his former employment as a laboratory director for Orchid Cellmark's Nashville office. He acknowledged that he was not an expert in probabilistic genotyping. He said that he did not analyze the evidence in this case but that he had reviewed the MNPD Crime Laboratory's analysis. His review showed that the laboratory followed generally accepted scientific principles. He concluded from his review of the data that the DNA mixture from the khaki pants contained the DNA of at least five people. He said the laboratory's records reflected that an analyst initially determined the mixture contained the DNA of at least three people and that an analyst later determined the mixture contained the DNA of at least four people. Dr. Watson said reanalysis of complex mixtures was common. He said Mr. DeBlanc's report of the mixture containing the DNA of at least four people was "reported that way . . . because of the requirement in [the MNPD Crime Laboratory] manual." Dr. Watson said he did not mean that Mr. DeBlanc's analysis was flawed. Dr. Watson said that Cybergenetics tested various "iterations" and that the testing they did, which assumed the DNA mixture had four contributors, was "wrong." Dr. Watson said that about thirty percent of the DNA in the mixture was likely from a female. He said he could not identify the number of males and number of females whose DNA was in the mixture.

Dr. Watson testified that he could not determine from his review the assumptions made by Cybergenetics in calculating the likelihood ratio for the match between the Defendant's DNA and the DNA mixture from the khaki pants. He did not know whether Cybergenetics had used a restrictive analysis method or a broad analysis method.

Dr. Watson testified that if two suspects were half-brothers, testing and obtaining a DNA profile for both would be "the only way to determine" whether a profile from a mixture matched one of the suspects. He said this was generally true of related individuals,

such as cousins. He said the likelihood ratio is calculated based upon the likelihood of a match to any unrelated individuals.

Dr. Watson testified that primary transfer DNA was left when a person touched an object. He said that DNA could also be transferred to a second person when the second person touched an object previously touched by a first person.

Dr. Watson testified that Dr. Perlin had "developed one of the better known software packages for doing this type of analysis." Dr. Watson agreed he had a degree in molecular biology but did not have a computer science degree. He said he knew Dr. Perlin had a computer science degree and was a medical doctor. Dr. Watson said that seven of the 200 to 300 state forensic testing laboratories in the United States used software from Cybergenetics.

Ms. Hornyak was recalled by the State and testified that Cybergenetics used the data it received from the MNPD Crime Laboratory using assumptions of four, five, six, and seven contributors to the DNA mixture. She said that after reviewing the data, they concluded that the DNA from more than four people was present and that at least six contributors were likely. She said the likelihood ratio was generated based upon the assumption of six contributors. She said the likelihood ratio was based upon multiple computer "runs" for the given assumption regarding number of contributors and was the "number in the middle from each of those independent runs."

Codefendant Davonta Sherrill testified that he had not been promised anything in exchange for his testimony but that he hoped the State would consider his cooperation in the Defendant's trial when resolving Mr. Sherrill's charges. Mr. Sherrill said that codefendant Troyvante Watkins and the Defendant were brothers and that Mr. Sherrill was their cousin. Mr. Sherrill said he was not related to codefendant Denzmore. Mr. Sherrill described his height as 6′3″ and the Defendant's height as 5′0″.

Mr. Sherrill testified that on the night of the incident, which he agreed was "August 5th or 6th," he drove a white Chrysler in which codefendant Watkins was a passenger to the victim's address because he and the codefendants wanted to "contact Michael's uncle," whose name Mr. Sherrill did not know. Mr. Sherrill said that he had not known the victim at the time. He said the Defendnat and codefendant Denzmore arrived at the same time in a separate car that was "the same kind." Mr. Sherrill said they all had handguns in their pockets: he had a Ruger 380; the codefendant Watkins and codefendant Denzmore each had a nine-millimeter; the Defendant had a .40-caliber. Mr. Sherrill said they arrived around 10:00 to 11:00 p.m., that they parked in a college parking lot, that he tried to call Michael's uncle, and that he did not see anyone outside. Mr. Sherrill said that they walked up a hill in an alley to "a certain spot" and that he was still unable to reach Michael's uncle. Mr. Sherrill said he was unable to see the parking lot that corresponded with the victim's

address. Mr. Sherrill said that the Defendant and codefendant Denzmore walked further up the alley with their guns out of their pockets, that he and codefendant Watkins remained in the "spot," and that the Defendant and codefendant Denzmore were gone for a few minutes. Mr. Sherrill said that he and codefendant Watkins were "basically ready to go" because Mr. Sherrill had been unable to contact Michael's uncle. Mr. Sherrill said that when the Defendant and codefendant Denzmore returned, codefendant Denzmore "stated that it was a n----- sitting in the car and to wait for them because they fixing to rob him." Mr. Sherrill described the Defendant as "kinda . . . like agreeing with him" when codefendant Denzmore made the statement. Mr. Sherrill said that codefendant Denzmore "was kind of . . . gassing it up" and that the Defendant told Mr. Sherrill and codefendant Watkins to wait for him. Mr. Sherrill said, "We basically told them y'all b---s------." Mr. Sherrill said he and codefendant Watkins walked back to the car. Mr. Sherrill stated that the Defendant and codefendant Denzmore walked up the hill a second time, that Mr. Sherrill heard gunshots and breaking glass as he and codefendant Watkins were getting into the car. Mr. Sherrill said he and codefendant Watkins left in the car. Mr. Sherrill said he had not seen who fired the shots. Mr. Sherrill agreed that he did not see the Defendant shoot a gun and kill the victim, that he did not see the Defendant go through the victim's pants pocket, and that he and his codefendants did not go to the scene to rob, hurt, or kill anyone.

Mr. Sherrill agreed that he was at Hallmark Apartments, near his grandmother's house, on August 4, 2015. He agreed that he was at Hallmark Apartments to sell marijuana to Mike Cotton. Mr. Sherrill was unsure if Mr. Cotton's uncle's name was Derek Mitchell. When asked if Mr. Cotton was supposed to provide a gun in exchange for the marijuana, Mr. Sherrill stated that Mr. Cotton had told Mr. Cotton's uncle the exchange was marijuana for a gun but that, according to Mr. Sherrill, the exchange was to be marijuana for cash. Mr. Sherrill agreed that Mr. Cotton brought a .40-caliber Smith & Wesson gun to the exchange. Mr. Sherrill said that it was his understanding that the gun belonged to Mr. Cotton's uncle.

Mr. Sherrill agreed that codefendant Denzmore was with him at Hallmark Apartments, that codefendant Denzmore had a nine-millimeter Glock with him, and that Mr. Cotton and Mr. Mitchell arrived. Mr. Sherrill agreed that Mr. Cotton showed him the .40-caliber gun and asked to see the marijuana, but Mr. Sherrill denied that he stole the .40-caliber gun. Mr. Sherrill agreed he "ended up with" the .40-caliber gun after Mr. Cotton dropped it in a struggle. Mr. Sherrill acknowledged that he left the meeting with the marijuana and the .40-caliber gun. He said he had seen Mr. Cotton's uncle and another person when Mr. Cotton ran away. Mr. Sherrill agreed that after this incident, Mr. Mitchell threatened Mr. Sherrill's grandmother's house and threatened to kill Mr. Sherrill. Mr. Sherrill agreed that Mr. Mitchell called him at least four times, that codefendant Denzmore was with Mr. Sherrill for at least one of these calls, and that codefendant Denzmore told

Mr. Sherrill, "I got it." Mr. Sherrill denied calling Mr. Mitchell and stating, "[T]he murder game is on."

Mr. Sherrill testified that he spoke with Detective Frank on August 10, 2015. Mr. Sherrill agreed that in the interview, he denied being "at that location." He said that at the time, he was trying to "save" himself because he "didn't have nothing to do with it." He agreed he met with Detective Frank again on August 12, at which time he identified the Defendant in a photograph lineup and told Detective Frank the caliber of the handgun the Defendant had on the night of the incident. Mr. Sherrill identified the Defendant in the courtroom.

Mr. Sherrill acknowledged that in his August 10 interview with Detective Frank, he told Detective Frank that he "went to the deal for a .40 Smith & Wesson." Mr. Sherrill said, "I [just told] them what they wanted to hear so I could go." Mr. Sherrill said he did not take the gun from Mr. Cotton. Mr. Sherrill claimed that he picked up the gun after Mr. Cotton dropped it. Mr. Sherrill said he did not give Mr. Mitchell and Mr. Cotton the marijuana. Mr. Sherrill said that in the first interview, he had not told the officers that he did not know anything about a robbery involving the .40-caliber Smith & Wesson. Mr. Sherrill stated that he had been the victim in that situation. He said he told the police he did not know anything about a murder and had not been at the scene. He agreed he had been untruthful when he told the police in the first interview that codefendant Denzmore had dropped him off "out west" and that he had been at a recording studio on the night the victim was shot.

Mr. Sherrill testified that he was taken into custody after the August 10 interview and that he was brought from the jail for the August 12 interview. Mr. Sherrill agreed that in the second interview, he told Detective Frank that on August 4, the .40-caliber Smith & Wesson "ended up on the ground" and that eventually, he got it. Mr. Sherrill agreed that he first said in the second interview that no one had the .40-caliber Smith & Wesson from the April 4 incident at the scene on the night of the victim's shooting, that he later stated he did not remember who had it, and that he eventually said the Defendant had it. Mr. Sherrill agreed that when he was asked in the August 10 interview about $380 he had at an unspecified time, he said that the Defendant had the money but later acknowledged he was the person with the money. He agreed that he provided information about the guns he and the codefendants had on the night of the victim's shooting. Mr. Sherrill said he did not tell the officers where to find the gun he had that night. He agreed he told the officers that the Defendant did not carry a gun regularly. Mr. Sherrill agreed that he never told the officers that the Defendant and codefendant Denzmore told him to "hold up" in order for the Defendant and codefendant Denzmore to rob the victim.

Regarding the night of the victim's shooting, Mr. Sherrill testified that he and his codefendants went to the scene because Mr. Sherrill had a prior conversation in which Mr.

-9-

Mitchell agreed to buy the gun Mr. Sherrill had taken from Mr. Cotton on August 4. Mr. Sherrill said he went without the gun because he first wanted to determine whether Mr. Mitchell was serious about the transaction. Mr. Sherrill said that Mr. Mitchell's mother and Mr. Sherrill's grandmother lived in the same apartment complex and that if Mr. Mitchell proved to be serious about the transaction, they could make the exchange at the apartment complex.

MNPD Detective Jason Frank testified that on August 6, 2015, he went to the scene where the victim was shot. He said he saw a red Dodge Charger with the driver's door open. He said the victim's body lay outside the car except for one leg still in the car. Detective Frank said he saw cartridge casings at the scene, bullet strike marks on a duplex, and bullet holes in windows. He said he spoke with the victim's wife, the victim's son, Mr. Mitchell, and Mr. Mitchell's wife or girlfriend. He said Mr. Mitchell lived in one of the duplexes. He said that in the following days, he spoke with Ms. Harris, who had dated the victim previously.

Detective Frank testified that on August 12, 2015, he obtained the victim's clothing, including the khaki pants, from the medical examiner and took them to the Metro Police Department's property room. He said that he had not interviewed the Defendant before he retrieved the pants and that he interviewed the Defendant on August 17.

Detective Frank testified that on August 12, 2015, codefendant Sherrill identified the Defendant in a photograph lineup. Detective Frank said that codefendant Sherill stated that the person he identified showed him a .40-caliber gun at the scene on the night of the victim's shooting.

Detective Frank testified that he interviewed codefendant Denzmore and the Defendant on August 17, 2015. He identified a disc containing a recording of the Defendant's interview and a transcript, and they were received as exhibits. The recording was played for the jury.

In the Defendant's interview, Detective Frank told the Defendant that an eyewitness had identified him and that the police had "some footage" from the alley. Detective Frank stated that he wanted the Defendant to tell him what happened on August 6 and that he believed it was related to a gun robbery on August 4. The Defendant denied that he owned a gun and that he fired a gun or shot anyone on August 6, but he later said he shot once in the air, heard gunshots, and ran. The Defendant agreed to provide a DNA sample. The Defendant asked repeatedly to view the video recording that Detective Franks claimed to have. The Defendant agreed that the "intent . . . was to go over here . . . and scare this guy

so that he would leave Smiley[2] alone . . [because] the beef was between him and Smiley not [the Defendant] and him."

Detective Frank acknowledged that, in an effort to make the Defendant "talk," Detective Frank falsely told the Defendant that a video recording of the incident existed. Detective Frank agreed he also falsely told the Defendant that a witness had identified the Defendant.

Detective Frank testified that he collected a DNA sample from the Defendant. Detective Frank said he requested ballistics testing on the bullet removed from the victim's body during the autopsy and on cartridge casings recovered from the scene. He said that he had information that a .40-caliber gun and a nine-millimeter gun were used during the incident but that the weapons were not recovered during the investigation. He said that after he learned the MNPD Crime Laboratory could not identify the four or more individuals who contributed to the DNA mixture on the victim's pants, he sent the "standards" collected from the pants and the Defendant's DNA to Cybergenetics for analysis.

Detective Frank testified that a purse found in a trash can at the scene was determined to be unrelated to the present case and that testing of items related to Reginald Ford, Jr., were determined to be unrelated to the present case. Detective Frank said that no blood was found on the victim's car and that the investigation did not establish that the victim had a prior relationship with or knowledge of the Defendant and the codefendants.

Detective Frank testified that the victim lived in the front of a duplex at the scene and that Mr. Mitchell lived in the back. He agreed he saw bullet holes in the back of the duplex and agreed that fourteen nine-millimeter cartridge casings were recovered. He agreed that the Defendant had not fired the nine-millimeter weapon and that the victim had been killed by a .40-caliber bullet. Detective Frank agreed that no .40-caliber casings were recovered. He acknowledged, however, that it had been raining when the police searched the alley at the scene, that water had run down the hill in the alley, and that they thought at the time that they were searching for nine-millimeter casings. He agreed that he returned to the scene later to look for .40-caliber casings but that he did not find any.

Detective Frank agreed that in the course of the investigation, he learned about the "preceding robbery" involving "Sosa[3] and Smiley" having taken a .40-caliber Smith & Wesson gun. Detective Frank agreed that the investigation of this robbery led him to

---

[2] Other evidence showed that codefendant Sherrill was known as Smiley.

[3] Other evidence showed that Sosa was codefendant Denzmore's nickname.

codefendants Denzmore and Sherrill and that, to his knowledge, the Defendant had no involvement. Detective Frank agreed that he interviewed codefendants Denzmore and Sherrill twice before speaking to the Defendant and that he never interviewed codefendant Watkins.

Detective Frank agreed that in codefendant Sherrill's August 10, 2015 interview, codefendant Sherrill made statements that Detective Watkins later determined were untrue. Detective Watkins agreed that codefendant Sherill stated that "the original deal was trading a Smith & Wesson .40 caliber for some marijuana."

Detective Frank agreed that he knew the Defendant and codefendant Sherrill were cousins and that the Defendant and codefendant Watkins were brothers. Detective Frank agreed that he did not obtain DNA samples from codefendants Sherrill, Watkins, and Denzmore. Detective Frank said the decision to submit the victim's khaki pants for DNA testing was made based upon the information received during the investigation. He said the cartridge casings were not submitted because the act of firing a bullet results in any DNA and fingerprint evidence on a bullet being burned away.

Rolandus Denzmore testified that he was charged as a codefendant in the present case. He agreed that he had not been promised anything in exchange for his testimony but hoped the prosecution would consider his cooperation.

Mr. Denzmore testified that on the night of August 5 and 6, 2015, he had been with the Defendant, codefendant Watkins, and codefendant Sherrill at a location which other evidence showed was on the victim's street. Mr. Denzmore said that he drove a white Chrysler Sebring with the Defendant as his passenger and that codefendants Sherrill and Watkins arrived in Mr. Denzmore's other white Chrysler Sebring. Mr. Denzmore said they parked, saw the victim drive up the alley, talked as they sat in the cars, and waited. Mr. Denzmore said that he, the Defendant, and codefendants Watkins and Sherrill walked up the hill in the alley and saw the victim sitting in his car. Mr. Denzmore said that he had not known the victim before that night. Mr. Denzmore said that on the night of the shooting, he had a Glock 17 nine-millimeter gun, that codefendant Watkins had a nine-millimeter handgun, that codefendant Sherrill had a .380-caliber gun, and that the Defendant had a .40-caliber gun. Mr. Denzmore said he and the Defendant walked to the parking area where the victim was sitting in his car. Mr. Denzmore said they had not yet called Mr. Mitchell and that he "figured" they were going to tell the victim to go inside before they called Mr. Mitchell.

Mr. Denzmore testified that he stood about five yards from the victim's car and that the Defendant, codefendant Watkins, and codefendant Sherrill stood next to him. Mr. Denzmore said he saw a man "raise up [out of the victim's car] and kind of lunge towards" the Defendant. Mr. Denzmore said he heard a gunshot and saw the man and the Defendant

"go down." Mr. Denzmore said that he saw a porch light come on and that he "panic fired" his nine-millimeter gun about ten times at "[t]he house." Photograph exhibits show that Mr. Denzmore fired multiple shots into a window of a bedroom where other evidence showed two children were sleeping. Mr. Denzmore agreed he could have fired fourteen times. He said he and the Defendant were the only people who fired guns that night.

Mr. Denzmore testified that after he fired his gun, he returned to his car. He said he and the Defendant left together and went to East Nashville. He agreed that the police tried to stop them "for something else," that he drove fast to get away, and that they threw their guns "out the window." He agreed he was arrested that night. He said he did not recall having called codefendant Sherrill from the jail to have codefendant Sherrill look for the discarded guns, but Mr. Denzmore agreed he might have done so. He said he returned later to look for the guns but did not find them.

Mr. Denzmore said that in a conversation with the Defendant after the incident, the Defendant stated he "went into [the victim's] pockets and found a lighter and a piece of paper." Mr. Denzmore said he had not seen the Defendant go into the victim's pockets. Mr. Denzmore acknowledged he had not told Detective Franks about the Defendant's having said he found a lighter in the victim's pocket. Mr. Denzmore agreed that when he met with Detective Frank a week or two later, Mr. Denzmore identified the Defendant from a photograph lineup.

Mr. Denzmore agreed that in August 2015, he often stayed with codefendant Sherrill in codefendant Sherrill's grandmother's apartment. Mr. Denzmore agreed that codefendant Sherrill did not have a gun at the time but that codefendant Sherrill sometimes possessed Mr. Denzmore's nine-millimeter gun. Mr. Denzmore acknowledged that codefendant Sherrill "probably" used Mr. Denzmore's gun to take Mr. Cotton's .40-caliber Smith & Wesson gun about two days before the incident in the present case. Mr. Denzmore agreed that he had been aware codefendant Sherrill had marijuana inside a City Gear bag. He said he did not know the quantity of the marijuana and agreed he previously told Detective Frank that it was less than one pound.

Regarding the prior incident involving Mr. Cotton, Mr. Denzmore agreed that he had been at codefendant Sherrill's grandmother's apartment with codefendant Sherrill, that Mr. Denzmore went outside to talk to a girl, and that Mr. Cotton arrived "to buy some weed." Mr. Denzmore agreed that he saw Mr. Cotton run out of the apartment and that codefendant Sherrill came out of the apartment with Mr. Denzmore's nine-millimeter gun and a black and silver Smith & Wesson gun. Mr. Denzmore agreed that he saw Mr. Mitchell "watching the whole time," but Mr. Denzmore said he had not known Mr. Mitchell's identity at the time. Mr. Denzmore agreed that Mr. Mitchell was Mr. Cotton's uncle. Mr. Denzmore agreed that after this incident, codefendant Sherrill began receiving

threats by telephone. Mr. Denzmore said he had not been present for the telephone calls. Mr. Denzmore said codefendant Sherrill knew where Mr. Mitchell lived.

Mr. Denzmore testified that he, the Defendant, codefendant Sherrill, and codefendant Watkins decided to "squash the beef" by going to Mr. Mitchell's house. Mr. Denzmore said they wanted to end the disagreement, that they were "[n]ot necessarily" going to Mr. Mitchell's house to scare Mr. Mitchell, and that they were not going to "shoot up" the house.

Mr. Denzmore agreed that in his interviews with Detective Frank, he stated that the victim was shot with the .40-caliber Smith & Wesson gun taken in the robbery of Mr. Cotton, that it was not the Defendant's gun, that the Defendant did not load it, and that the Defendant's fingerprints would not be on it. Mr. Denzmore agreed that codefendant Sherrill had possessed the .40-caliber Smith & Wesson gun that night. Mr. Denzmore acknowledged that when he shot the nine-millimeter gun, he knew he was shooting at Mr. Mitchell's house. Mr. Denzmore said Mr. Mitchell lived in the unit in the back of the house, next to the alley.

Mr. Denzmore agreed that he felt pressured to provide information during his interviews, that he was in jail at the time of the interviews, and that he wanted to go home. He agreed that after he was charged and had posted bond in the present case, he removed his ankle monitor and failed to appear for a court date and that he had to be captured by "bounty hunters" about five months later. He agreed that he had been in jail without bond since then and that he hoped his testifying would result in his release from jail.

Michael Cotton testified for the defense that in August 2015, he knew codefendants Sherrill and Denzmore as Smiley and Sosa, respectively. Mr. Cotton said that he had a planned transaction with codefendant Sherrill to trade Mr. Cotton's gun for a pound of marijuana at codefendant Sherrill's grandmother's house. Mr. Cotton said that after he arrived for the transaction, codefendant Sherrill showed him marijuana, that it was less than one pound, and that Mr. Cotton was going to walk out. Mr. Cotton said codefendant Sherrill "put a gun to" Mr. Cotton's stomach and said, "I'm gonna need that, Mike, I'm gonna need that for real, come on." Mr. Cotton said codefendant Sherrill told codefendant Denzmore to "crack [Mr. Cotton] up side the head" because Mr. Cotton initially was not going to surrender his .40-caliber gun. Mr. Cotton said he gave codefendant Sherrill the gun, fled, and told his uncle what happened. Mr. Cotton said he gave codefendant Sherrill's telephone number to Mr. Cotton's uncle.

After receiving the evidence, the jury found the Defendant guilty of first degree felony murder of the victim in the commission of or attempt to commit theft, second degree murder of the victim, attempted especially aggravated robbery of the victim, two counts of attempted first degree premeditated murder of Ms. Mitchell's two minor children, and two

counts of employing a firearm in the commission of a dangerous felony. After the sentencing hearing, the trial court merged the first degree felony murder and second degree murder convictions. The court imposed a life sentence for first degree felony murder and Range I sentences as follows: twenty-one years for each of the two convictions for attempted first degree murder, six years for each of the two convictions for employing a firearm during the commission of a dangerous felony, and ten years for the conviction for attempted especially aggravated robbery. The court imposed the sentences for attempted first degree premeditated murder concurrently with each other but consecutively to the first degree felony murder sentence. It imposed the sentences for employing a firearm during the commission of a dangerous felony concurrently with each other but consecutively to the sentences for attempted first degree murder. It imposed a ten-year sentence for attempted especially aggravated robbery, to be served concurrently with the first degree felony murder sentence. The effective sentence was life plus twenty-seven years. This appeal followed.

# I

## Sufficiency of the Evidence

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*,

158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

### A. First Degree Felony Murder & Second Degree Murder

The Defendant argues that the evidence is insufficient to support his merged convictions for first degree felony murder and second degree murder of the victim. The Defendant argues that the State failed to establish beyond a reasonable doubt that he was the perpetrator of the crimes and because his convictions rest solely upon the uncorroborated testimony of his accomplices. The Defendant also argues that the evidence is insufficient to support his first degree felony murder conviction because the evidence failed show that he committed the predicate felony of robbery or attempted robbery. The record reflects, however, that the indicted predicate felony in the present case was theft or attempted theft. We will consider the sufficiency of the evidence of the offenses of which the Defendant was charged and convicted.

### 1. First Degree Felony Murder

As relevant to this appeal, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft[.]" T.C.A. § 39-13-202(a)(2) (2018) (subsequently amended). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a) (2018).

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> > (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
> >
> > (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> >
> > (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person

believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a)(1)-(3) (2018).

"[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013). In order for accomplice testimony to be adequately corroborated:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); *see Shaw*, 37 S.W.3d at 903.

Viewed in the light most favorable to the State, the evidence shows that codefendants Sherrill and Denzmore had been involved in a planned drug deal with Mr. Cotton days before the victim's death. An altercation occurred during the purported drug deal, during which codefendant Sherrill took Mr. Cotton's .40-caliber gun. Mr. Mitchell, who was Mr. Cotton's uncle, threatened codefendant Sherrill after the gun was taken. On the night of the victim's shooting, the Defendant and his codefendants went to the area where Mr. Mitchell lived in a duplex to find Mr. Mitchell. When the Defendant and codefendants were unable to find Mr. Mitchell, codefendant Denzmore and the Defendant hatched a plan to rob the victim, who was seated in his car outside the duplex. The Defendant fired a single .40-caliber bullet from the .40-caliber Smith & Wesson handgun codefendant Sherrill had taken in the earlier purported drug deal. After the victim was on the ground, the Defendant went through the victim's pockets.

The record reflects that codefendants Sherrill and Denzmore testified that the Defendant was with them during the offenses and that they, the Defendant, and codefendant

Watkins were armed. Codefendant Sherrill testified that codefendant Denzmore stated at the scene that he and the Defendant were going to rob a man who was sitting in a car and that the Defendant's mannerisms indicated the Defendant agreed to the plan. Codefendant Sherrill stated that the Defendant told codefendants Sherrill and Watkins to wait while they committed the robbery. Codefendant Sherrill said that he and codefendant Watkins were walking to a car when they heard gunshots and breaking glass. Codefendant Denzmore testified that the Defendant walked to the victim's car, that the victim lunged at the Defendant, and that codefendant Denzmore heard a gunshot and saw the Defendant and the victim go down. In his pretrial statement, the Defendant admitted that he was at the scene with his codefendants, that he was armed with a gun he obtained from codefendant Sherrill, and that he fired a shot, despite denying that he shot the victim. The Defendant said in his statement that he had gone to the scene because he and the codefendants wanted to scare a man into leaving codefendant Sherrill alone. Additional evidence showed that codefendant Sherrill had been involved in a dispute with Mr. Mitchell about a gun codefendant Sherrill took in an encounter that he and codefendant Denzmore had with Mr. Cotton days earlier. Mr. Mitchell lived in a duplex at the scene. Forensic evidence showed that the Defendant's DNA was identified as a probable match with a DNA profile collected from the victim's pants pocket. Codefendant Denzmore testified that the Defendant told him after the shooting that the Defendant had gone through the victim's pants pockets. A forensic analyst testified that some of the victim's pants pockets were turned out or partially turned out. Codefendant Denzmore testified that the Defendant had a .40-caliber weapon on the night of the incident, and remnants of a .40-caliber bullet were recovered during the victim's autopsy.

The testimony of codefendants Sherrill and Denzmore, which inculpated the Defendant in a plan to rob the victim, in possessing and firing a gun, and in rifling through the victim's pockets, was corroborated by the DNA evidence from the victim's pants and the .40-caliber bullet remnants recovered during the autopsy. Although the Defendant said in his pretrial statement that he went to the scene with the codefendants to scare Mr. Mitchell and that he shot once in the air and fled when he heard other gunshots, the jury was free to discredit his testimony and to credit the other evidence pointing to his guilt. This court will not invade the province of the trier of fact by reassessing the credibility of witnesses and reweighing the evidence. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547.

Viewed in the light most favorable to the State, the evidence is sufficient to show that the Defendant possessed the intent to commit a theft and that the victim was killed during the perpetration of or attempt to perpetrate the theft. The felony murder statute merely requires that a defendant have the requisite intent to commit the predicate offense and that a killing occur during the commission of the predicate offense. *See* T.C.A. § 39-13-202(a)(2); *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). Thus, the evidence is sufficient to support the Defendant's conviction of first degree felony murder.

In reaching this conclusion, we have considered the Defendant's argument that the evidence is insufficient to support his first degree felony murder conviction because the trial court erred in admitting evidence of his pretrial statement and of the DNA analysis identifying him as a probable contributor to the DNA mixture collected from the victim's pants pocket. For reasons stated elsewhere in this opinion, the trial court did not err in admitting this evidence. In any event, a review of the sufficiency of the evidence necessarily includes all of the evidence admitted at the trial, whether admitted within the trial court's discretion or admitted in error. *See, e.g.*, *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981).

### 2. Second Degree Murder

As relevant here, second degree murder is the unlawful and knowing killing of another. T.C.A. § 39-13-210 (2014) (subsequently amended). Viewed in the light most favorable to the State, the evidence shows that the Defendant approached the victim and shot him in the head at close range. The act of shooting someone in the head at intermediate range is reasonably certain to cause the result of death. *See id.* § 39-11-106(a)(20) (2018) (subsequently amended) ("A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."). For the reasons we have stated above, the rational jury could credit the evidence that the Defendant was the person who shot the victim and that adequate corroboration existed for the testimony of codefendants Sherrill and Denzmore.

The evidence is sufficient to support first degree felony murder and second degree murder convictions for the homicide of the victim.

### B. Attempted First Degree Premeditated Murder

Relative to his convictions for attempted first degree premeditated murder of the two children inside the duplex, the Defendant argues that the State failed to prove beyond a reasonable doubt that he was criminally responsible for the conduct of codefendant Denzmore, whom the evidence shows fired multiple shots into the Mitchell residence. Alternatively, the Defendant argues that the evidence is insufficient to show that codefendant Denzmore committed the acts with premeditation.

First degree premeditated murder is the unlawful, intentional, and premeditated killing of another. *Id.* §§ 39-13-201 (2018), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. T.C.A. § 39-11-106(a)(18) (2018) (subsequently amended) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the

result"); *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

"Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *Dorantes*, 331 S.W.3d at 386 (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

A person is criminally responsible for an offense committed by the conduct of another, if:

. . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2018). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

Viewed in the light most favorable to the State, the evidence shows that the Defendant and his codefendants each armed themselves with guns and went to the scene looking for Mr. Mitchell, who was the victim's neighbor. The Defendant and the codefendants either planned to sell a gun to Mr. Mitchell that codefendant Sherrill had taken from Mr. Mitchell's nephew, Mr. Cotton, a few days earlier, or they planned to scare Mr. Mitchell, who had endeavored upon an intimidation campaign directed at codefendant Sherrill. Codefendant Denzmore had been present for codefendant Sherrill's earlier encounter with Mr. Cotton, although codefendant Denzmore had been outside the

-20-

apartment where it occurred, and codefendant Denzmore was aware of Mr. Mitchell's threats to codefendant Sherrill after the gun was taken. While searching for Mr. Mitchell, the Defendant and codefendant Denzmore saw the victim sitting in his car. Codefendant Denzmore announced a plan to rob the victim. The Defendant indicated his agreement and told the other codefendants to wait while he and codefendant Denzmore committed the robbery. Codefendant Denzmore testified that he heard a gunshot, that he saw the Defendant and the victim "go down," that he saw a porch light come on, and that he "panic fired" his gun about ten times at "[t]he house" but might have fired fourteen times. Photograph exhibits show that codefendant Denzmore fired multiple shots into a window, and other evidence showed that two children were in the bedroom. Codefendant Denzmore testified that he and the Defendant were the only people who fired a gun that night and that they disposed of their weapons as they fled the scene.

From this evidence, a rational jury could conclude that codefendant Denzmore went to the scene armed with a handgun with the intent to provide protection to codefendant Sherrill, who planned to resell to Mr. Mitchell the gun codefendant Sherrill had recently taken from Mr. Cotton, or with the intent to otherwise intimidate Mr. Mitchell. Once they arrived and were unable to find Mr. Mitchell, codefendant Denzmore and the Defendant developed the plan to rob the victim. They approached the victim, and the Defendant shot the victim in the head. Codefendant Denzmore heard the gunshot and saw a light come on, and he fired his gun at least ten times into an occupied bedroom in the duplex as the Defendant went through the victim's pockets. Although codefendant Denzmore claimed he "panic fired" his gun, the jury could have rejected his credibility on this point and have inferred, given codefendant Denzmore's repeated firing into a residence that he knew was occupied due to his having seen the light come on, that he fired the shots in order to facilitate the Defendant's efforts to commit a theft from the victim, to prevent the person who turned on the light from coming outside or seeing that events transpiring outside, and to allow himself and his companions to escape after the homicide. The jury could also infer from the evidence that codefendant Denzmore fled the scene and threw his gun out the window during the escape in order to conceal his involvement in the crimes he had just committed.

The Defendant's common intent in this endeavor is shown by the evidence that the Defendant and the codefendants armed themselves and went to the scene to locate Mr. Mitchell, that the Defendant agreed with and acted on codefendant Denzmore's announcement of a plan to rob the victim, that the Defendant told codefendants Sherrill and Watkins to wait while the Defendant and codefendant Denzmore committed the robbery, that the Defendant fled the scene with codefendant Denzmore after both had fired their guns in furtherance of the criminal acts, and that the Defendant and codefendant Denzmore discarded their weapons while fleeing together.

The evidence is sufficient to support the Defendant's convictions for attempted first degree murder.

## C. Attempted Especially Aggravated Robbery

In the same vein as his arguments for first degree felony murder and second degree murder, the Defendant argues that the evidence is insufficient to support his conviction of attempted especially aggravated robbery of the victim because the State failed to establish his identity as the perpetrator and because the conviction rests upon uncorroborated testimony of accomplices.

Especially aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon . . . [w]here the victim suffers serious bodily injury." T.C.A. 39-13-403(a)(1), (2) (2018). Robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* 39-13-401(a) (2018).

Viewed in the light most favorable to the State, the evidence shows that the Defendant and his codefendants armed themselves and went to the scene in search of Mr. Mitchell. Although they failed to locate him, they embarked upon an alternate plan to rob the victim. The Defendant indicated his agreement with the plan when it was announced by codefendant Denzmore, told the other codefendants to wait, approached the victim, shot the victim in the head, and rifled through the victim's pockets. As we have stated above, the State provided sufficient evidence of the Defendant's identity and to corroborate the testimony of codefendants Sherrill and Denzmore. The evidence is sufficient to support the especially aggravated robbery conviction.

## D. Employing a Firearm During the Commission of a Dangerous Felony

The Defendant argues that the evidence is insufficient to support his convictions of of employing a firearm in the commission of a dangerous felony because the State failed to prove beyond a reasonable doubt that he committed the predicate offenses, attempted first degree premeditated murder.

As relevant to this case, "It is an offense to employ a firearm or antique firearm during the . . . [c]ommission of a dangerous felony [or] [a]ttempt to commit a dangerous felony[.]" *Id.* § 39-17-1324(b)(1), (2) (2018) (subsequently amended). Viewed in the light most favorable to the State, the evidence shows that the Defendant possessed a firearm when he acted with criminal responsibility for codefendant Denzmore's shooting into an occupied duplex. We have concluded previously that the evidence is sufficient to support the Defendant's attempted first degree murder convictions. Likewise, the evidence is sufficient to support the convictions for employing a firearm during the commission of a dangerous felony.

The Defendant is not entitled to relief on this basis.

## II

## Admissibility of Expert Testimony

The Defendant contends that the trial court abused its discretion in denying his motion to exclude evidence related to the DNA evidence. The record reflects that the State obtained evidence which showed, through probabilistic genotyping DNA analysis, that the DNA mixture collected from the victim's pants pocket contained DNA that was 470,000 times more likely to have come from the Defendant than from an unrelated person. The parties engaged in substantial pretrial litigation regarding the State's proposed evidence. The Defendant sought exclusion of the evidence pursuant to Tennessee Rules of Evidence 104, 702, and 703; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 573 (1993); and *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997). The trial court denied the motion to exclude the evidence. The Defendant argues in his brief that the evidence should have been excluded because (1) probabilistic genotyping and its use of a likelihood ratio are "not foundationally valid" and do not substantially assist the trier of fact in understanding the evidence or determining a fact in issue, (2) the TrueAllele software used to generate the analysis is not reliable because it was not properly validated in this case, and (3) the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. At oral argument, the Defendant further refined his argument. Defense counsel argued, "[The Defendant] is not arguing that probabilistic genotyping is not valid in certain circumstances. Indeed it is." Rather, counsel argued, the issue before this court was how many contributors could be involved in a mixture before the science became unreliable. The State counters that the trial court did not abuse its discretion in admitting the evidence. Our research reflects that the question of the admissibility of probabilistic genotyping evidence is one of first impression for a Tennessee appellate court.

Tennessee Rule of Evidence 702 provides the following foundation for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 provides, "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." In *McDaniel*,

our supreme court listed the following nonexclusive factors a trial court may consider "in determining reliability" of proposed expert testimony:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested;
>
> (2) whether the evidence has been subjected to peer review or publication;
>
> (3) whether a potential rate of error is known;
>
> (4) whether . . . the evidence is generally accepted in the scientific community; and
>
> (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d at 265. Our supreme court has also said that, in assessing the reliability of an expert's methodology, a trial court may consider the expert's qualifications and the connection between the expert's knowledge and the basis of his or her opinion. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 274-75 (Tenn. 2005). "[Q]uestions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of trial court." *McDaniel*, 955 S.W.2d at 263; *see State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). An appellate court may disturb the trial court's ruling only if the trial court abused or arbitrarily exercised its discretion. *McDaniel*, 955 S.W.2d at 263-64; *see State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000).

As regards expert evidence of DNA analysis, our legislature has recognized the general trustworthiness and reliability of such evidence by enacting a statute providing for its admissibility:

> (a)    As used in this section, unless the context otherwise requires, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes.
>
> (b)(1)    In any civil or criminal trial, hearing or proceeding, the results of DNA analysis, as defined in subsection (a), are admissible in evidence without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material upon a showing that the offered testimony meets the standards of admissibility set forth in the Tennessee Rules of Evidence.

-24-

(2)     Nothing in this section shall be construed as prohibiting any party in a civil or criminal trial from offering proof that DNA analysis does not provide a trustworthy and reliable method of identifying characteristics in an individual's genetic material, nor shall it prohibit a party from cross-examining the other party's expert as to the lack of trustworthiness and reliability of such analysis.

(c)     In any civil or criminal trial, hearing or proceeding, statistical population frequency evidence, based on genetic or blood test results, is admissible in evidence to demonstrate the fraction of the population that would have the same combination of genetic markers as was found in a specific biological specimen. For purposes of this subsection (c), "genetic marker" means the various blood types or DNA types that an individual may possess.

T.C.A. § 24-7-118 (2017) (formerly codified at § 24-7-117).

As we have stated, the issue of the admissibility of DNA analysis involving probabilistic genotyping is one of first impression in Tennessee.  The Defendant acknowledges that evidence of DNA analysis is generally admissible pursuant to Code section 24-7-118 but argues that the statute "narrowly defines" DNA analysis in a manner that includes "'traditional' DNA analysis" involving comparison of a known DNA sample with "a single-source sample or simple mixture of two individuals where one of the contributors is known" and does not contemplate "the subsequent statistical analysis of the [MNPD Crime Laboratory's] findings by a computer program like TrueAllele."  We are unpersuaded by the Defendant's argument.  The record reflects that the initial processing of the DNA evidence was completed by the MNPD Crime Laboratory and that Mr. DeBlanc and another, unnamed individual separately concluded that the computations required for further analysis of the mixture were beyond human capacity and that computer analysis was needed.  Cybergenetics used TrueAllele's established mathematical and statistical methodology to complete the computations.

The trial court conducted lengthy hearings regarding the admissibility of the DNA evidence developed through probabilistic genotyping.  After receiving the evidence, the court engaged in a *McDaniel* analysis and determined that the evidence was admissible. We will summarize the evidence from the hearing, to the extent it is relevant to the issue raised on appeal.

Dr. Mark Perlin, a medical doctor with Ph.D. degrees in mathematics and computer science and the Chief Scientific Officer of Cybergenetics, testified as an expert in DNA evidence interpretation, likelihood ratios, and computer science.  He said that TrueAllele

was a Cybergenetics "computer system that conducts a mathematical analysis using software to derive identification information from DNA evidence" in a type of analysis called probabilistic genotyping. Dr. Perlin testified at length about the biological underpinnings of DNA evidence and the process of human DNA analysis. According to a document offered as an exhibit to Dr. Perlin's testimony,

Probabilistic genotyping refers to the use of biological modeling, statistical theory, computer algorithms, and probability distributions to calculate likelihood ratios (LRs) and/or infer genotypes for the DNA typing results of forensic samples ("forensic DNA typing results"). Human interpretation and review is required for the interpretation of forensic DNA typing results in accordance with the FBI Director's Quality Assurance Standards for Forensic DNA Testing Laboratories. Probabilistic genotyping is a tool to assist the DNA analyst in the interpretation of forensic DNA typing results. Probabilistic genotyping is not intended to replace the human evaluation of the forensic DNA typing results or the human review of the output prior to reporting.

A probabilistic genotyping system is comprised of software, or software and hardware, with analytical and statistical functions that entail complex formulae and algorithms. Particularly useful for low-level DNA samples (i.e., those in which the quantity of DNA for individuals is such that stochastic effects may be observed) and complex mixtures (i.e., multi-contributor samples, particularly those exhibiting allele sharing and/or stochastic effects), probabilistic genotyping approaches can reduce subjectivity in the analysis of DNA typing results. Historical methods of mixture interpretation consider all interpreted genotype combinations to be equally probable, whereas probabilistic approaches provide a statistical weighting to the different genotype combinations. Probabilistic genotyping does not utilize a stochastic threshold. Instead, it incorporates a probability of alleles dropping out or in. In making use of more genotyping information when performing statistical calculations and evaluating potential DNA contributors, probabilistic genotyping enhances the ability to distinguish true contributors and non-contributors. A higher LR is typically obtained when evaluating a person of interest (POI) who is a true contributor to the evidence profile, and a lower LR is typically obtained when the POI is not a true contributor. While the absence of an allele or the presence of additional allele(s) relative to a reference sample may support an exclusion, probabilistic genotyping approaches allow inclusion and exclusion hypotheses to be considered by calculating a LR in which allele drop-out and drop-in may be incorporated.

-26-

Scientific Working Group on DNA Analysis Methods, SWGDAM Guidelines for the Validation of Probabilistic Genotyping Systems, at 2 (2015).

Dr. Perlin testified that validation studies regarding the reliability of TrueAllele had been conducted by Cybergenetics, crime laboratories, or collaboratively by Cybergenetics and crime laboratories. He said that thirty-six such studies existed, that seven had been peer reviewed and published in journals, and that one of the peer-reviewed, published studies had been conducted independently of any involvement by Cybergenetics. He said that TrueAllele conformed with standards published by the Scientific Working Group on DNA Analysis Methods (SWGDAM). Dr. Perlin said that TrueAllele and the mathematical computation and algorithms it used were generally accepted in the scientific community, that TrueAllele was used routinely in eight laboratories' case work, and that evidence derived from using TrueAllele had been the subject of "over fifteen admissibility rulings" in courts in the United States. He said that TrueAllele's source code was available for review under secure conditions, that review would take about ten years, and that validation of the software could be accomplished within one to two hours by testing the software with known samples.

Regarding the reliability of TrueAllele to analyze mixtures containing DNA from multiple contributors, Dr. Perlin testified that validation studies existed for mixtures containing DNA from two, three, and four persons. He said the FBI had validated its probabilistic genotyping system for use on mixtures containing up to five contributors. In addition, Dr. Perlin said that a validation study for up to seven contributors had been conducted and that publication of the study was forthcoming at the time of the hearing.

Nathaniel Adams, a Systems Engineer with Forensic Bioinformatic Services, testified as a defense expert in computer science as applied to forensic DNA. He held a bachelor's degree in computer science and was working to complete his master's degree. He was critical of TrueAllele as not complying with the Institute of Electronic Engineers (IEEE) verification and validation standard for software systems. He noted, as well, that a President's Council of Advisors on Science and Technology (PCAST) report from two years earlier[4] stated that probabilistic genotyping was appropriate for analyzing mixtures of three or fewer DNA contributors, provided that the minor contribution was no less than 20%. Mr. Adams stated that the report said that further study was needed to establish the propriety of using probabilistic genotyping systems on mixtures containing more than three contributors or with lower-level contributions. Mr. Adams noted that human input regarding the number of contributors and the choice of whether or not to apply the differential degradation filter could affect TrueAllele's output. In addition, Mr. Adams expressed concern about "bugs" documented in the TrueAllele "wiki," or "change log,"

---

[4] The record reflects that the hearing took place in October 2018.

some of which reflected significant or critical issues with the software.  He said that number of identified bugs caused him concern that undetected bugs might exist.  He advocated for a "ground up" review of any probabilistic genotyping software to determine whether the system operated "within its expected bounds."  Regarding TrueAllele, he acknowledged that he had not reviewed its source code and said that the more lengthy a review, the more productive it could be.  He said that a "thorough verification and validation process" following IEEE standards would take one and one-half to five years but that a shorter review, "on the order of hours or days" could nevertheless be helpful.

Mr. Adams testified that, in his opinion based upon review of the material he had been provided, which included validation studies involving DNA mixtures from four to seven contributors, he "would question the reliability of [TrueAllele] to deliver the underlying intent."  In his opinion, the validation studies were insufficient to ensure reliability because little attention had been given to determining whether TrueAllele "follow[ed] all of its claimed steps."

Mr. Adams agreed that Dr. Perlin was "basically a world-renowned expert" in probabilistic genotyping and that probabilistic genotyping was generally accepted in the scientific community, with TrueAllele being among the available probabilistic genotyping software programs.

Dr. Perlin was recalled after Mr. Adams' testimony and stated that he was unaware of any standards in the forensic scientific community with which Cybergenetics was noncompliant.  Dr. Perlin stated that IEEE standards were not legal or scientific standards and that they were "created in order to facilitate communication for large software projects, often involving thousands of programs in different locations."  He said that software products such as TrueAllele were created by two or three programmers working closely together.  He noted, as well, that IEEE had said that its standards might not be appropriate for smaller entities.  He said that the TrueAllele bugs about which Mr. Adams had expressed concern were identified during Cybergenetics' internal testing of TrueAllele and that the bugs had been resolved before the software was delivered to customers.

After receiving the testimony and the voluminous documentary and audiovisual exhibits, the trial court entered its order denying the Defendant's motion to exclude the evidence.  As we have stated, the court conducted an analysis pursuant to the Rules of Evidence and *McDaniel*.

Our analysis begins with the question of whether the proper analysis of the question of admissibility of probabilistic DNA evidence involves Code section 24-7-118, or whether the statute does not apply and, instead, the full *McDaniel* analysis is proper.  In that regard, we observe that despite the lack of guidance in Tennessee specific to probabilistic

genotyping evidence, our supreme court has had the opportunity to consider whether Code section 24-7-118 applies to different scientific methods of DNA analysis.[5]

To date, our supreme court has resisted efforts to limit application of the DNA admissibility statute to only certain types of DNA analysis. In applying the statute to evidence involving polymerase chain reaction (PCR) analysis of DNA evidence, our supreme court has said that the evidence is admissible pursuant to the statute but that the parties "are nevertheless allowed to offer proof that DNA analysis is not trustworthy and reliable" and that such evidence "will go to the weight, not the admissibility, of DNA evidence." *State v. Begley*, 956 S.W.2d 471, 478 (Tenn. 1997) ("For example, a party can challenge the reliability of a particular test in any given case by a showing of sloppy handling of samples, failure to train the personnel performing the testing, failure to follow protocol, and the like."); *see State v. Reid*, 164 S.W.3d 286, 336 (Tenn. 2005). In a case involving mitochondrial DNA (mtDNA), the supreme court held that the plain language of the statute compelled a conclusion that the trial court did not err in denying the defendant's request for a pretrial hearing on the admissibility of DNA evidence. *See Scott*, 33 S.W.3d at 756-59 ("Because the very purpose of a *McDaniel* hearing is to determine the *reliability* of scientific or technical evidence, it would make little sense for this Court to require such a hearing for evidence that is statutorily admissible without antecedent testimony that it is a reliable method of identification."). A panel of this court has applied the statute to a question of admissibility of restriction fragment length polymorphism (RFLP) DNA analysis and associated statistical probability evidence. *See State v. James Thomas Manning*, No. M2004-03035-CCA-R3-CD, 2006 WL 163636, at *3-6 (Tenn. Crim. App. Jan. 24, 2006), *perm. app. denied* (Tenn. May 1, 2006).

We acknowledge that the science regarding DNA analysis is advancing. However, the plain language of the DNA admissibility statute is clear, and our supreme court has

---

[5] For example, in the PCR method, the DNA sample is processed with an enzyme and heating treatment in order to "amplify" the DNA before it is compared to a known sample to determine if both contain the same pattern. *State v. Begley*, 956 S.W.2d 471, 474 (Tenn. 1997). The RFLP method involves enzymatic fractionalization of DNA molecules and comparing the length and location of the fragments between a known sample and a specimen. *Id.* MtDNA analysis involves the examination of cellular mitochondria, which comprises only a portion of a cell and is heritable from a person's mother. *State v. Scott*, 33 S.W.3d 746, 757 (Tenn. 2000). Unlike traditional DNA analysis involving a comparison of a known sample with an unknown specimen to determine if a match between the two exists, mtDNA analysis is more a tool of exclusion than one of inclusion because maternal relatives share the same mtDNA. *Id.* Y-STR DNA analysis involves the examination of the Y chromosome, which only men have, and is identical for all men of the same paternal lineage. *Powers v. State*, 343 S.W.3d, 36, 45 n.13 (Tenn. 2011) (citing David H. Kaye, *The Double Helix and the Law of Evidence*, 209 (2010)).

enforced it accordingly: Evidence of DNA analysis involving comparison of a human biological specimen with another biological specimen for identification purposes is admissible, and no foundational testimony regarding trustworthiness and reliability is required, provided the evidence is otherwise admissible in accord with the Tennessee Rules of Evidence. *See* T.C.A. § 24-7-118(a), (b)(1). While a party may cross-examine a DNA expert about the trustworthiness and reliability of the evidence, such evidence goes to the weight to be afforded the evidence, not to its admissibility. *See id.* at (b)(2). The statute makes no distinction as to the admissibility of various methods of DNA analysis, and to date, our supreme court has not recognized any exceptions to our legislature's broad rule relative to the admissibility of DNA analysis evidence. As an intermediate appellate court, we are compelled to follow the statutes promulgated by our legislature and are guided by our supreme court's prior interpretations of those statutes.

As applied to the facts of this case, Code section 24-7-118 provides for the admissibility of DNA evidence regarding identification, and the record reflects the trial court's finding that the probabilistic genotyping evidence offered by the State was relevant and material to the question of the Defendant's identity as a perpetrator of the crimes. *See* Tenn. R. Evid. 401, 402. The court's findings addressed the requirement of Rule 702 that the evidence must substantially assist the trier of fact. With respect to these matters, the court stated:

> Here, the Court finds the TrueAllele analysis relevant under Rule 401 because it tends to identify the Defendant as a participant in the aggravated robbery. The State's proposed expert, Dr. Mark Perlin, was shown to be extensively qualified, by education and experience, in the fields of DNA interpretation and computer science. His testimony would substantially assist the jury to understand the complex genotyping evidence.

Although Dr. Perlin ultimately did not testify at the trial, the court accepted Cybergenetics employee Jennifer Hornyak as an expert in forensic DNA and probabilistic genotyping at the trial. As our supreme court has recognized, the requirement of Rule 703 that the evidence be trustworthy has been addressed by Code section 24-7-118's acceptance of DNA identification evidence as trustworthy and reliable. *See Begley*, 956 S.W.2d at 477.

We conclude that based on our supreme court's decisions analyzing Code section 24-7-118, probabilistic genotyping DNA analysis is "DNA analysis" encompassed by the broad language of the statute. As a result, there is no threshold admissibility requirement pursuant *McDaniel* for admission of DNA analysis which utilizes probabilistic genotyping and otherwise meets the standards of admissibility set for in the Tennessee Rules of Evidence. The record reflects that the court considered and made findings relative to the relevant Rules of Evidence, and those findings are supported by the record. We conclude that the trial court did not abuse its discretion in admitting the evidence.

The Defendant argues that the evidence of the likelihood ratio should have been excluded pursuant to Tennessee Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice. He argues that the likelihood ratio evidence was too difficult for the jury to understand without misinterpretation. As we have stated, the trial court found that the probabilistic genotyping evidence would substantially assist the trier of fact, and Code section 24-7-118 provides for the admissibility of DNA identification evidence. The record reflects that the likelihood ratio is a component of probabilistic genotyping DNA identification evidence and that it explains the relative strength or weakness of the association between the known sample and the unknown mixture. Thus, it is an integral part of the probabilistic genotyping DNA identification evidence. The question of whether the likelihood ratio evidence's probative value outweighs the danger of unfair prejudice is answered by the trial court's finding that the probabilistic genotyping evidence was relevant, probative, and would substantially assist the trier of fact. We conclude after a review of the record and the relevant law that Rule 403 did not bar the admission of the likelihood ratio evidence.

We note that the Defendant has not alleged that he was prevented from cross-examining the State's experts about the trustworthiness and reliability of the DNA evidence. *See* T.C.A. § 24-7-118. In his brief, the Defendant argues that TrueAllele has not been shown to be reliable and trustworthy for DNA analysis for complex mixtures involving as many as seven contributors or for mixtures that may involve related persons. The record reflects that the defense thoroughly explored these issues at the trial, both on cross-examination of the State's witnesses and through the testimony of a defense expert. As contemplated by the statute, the weight and credibility to be afforded to the DNA identification evidence was placed before the jury. The Defendant is not entitled to relief on this basis.

## III

### Denial of Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress his pretrial statement. He argues that the statement was not knowingly and voluntarily given because it was given after "coercive promises of leniency and false claims about the evidence against him."

At the suppression hearing, Detective Frank testified that he interviewed the Defendant on August 17, 2015. Detective Frank said that the Defendant appeared voluntarily for the interview. Detective Frank agreed that he had interviewed codefendants Sherrill and Denzmore before the Defendant's interview. Detective Frank said he knew from his earlier interviews with codefendants Sherrill and Denzmore that a homicide and robbery occurred after codefendants Sherrill and Denzmore went to a location where they

planned to scare a person whom they had robbed a couple of nights earlier. Detective Frank said codefendant Denzmore stated that the Defendant had been present and had killed the victim. Detective Frank recalled that codefendant Sherrill had stated, "[O]nce they got there and saw [the victim], . . . they decided that they would attempt to rob him while they were there." Detective Frank said codefendant Sherrill stated that the Defendant had "[t]he gun that was taken during the [earlier] robbery, which was a Smith and Wesson forty caliber handgun." Detective Frank said that at the time of the Defendant's interview, Detective Frank had not known the caliber of the bullet with which the victim had been shot.

Detective Frank testified that codefendant Denzmore had said in his interview that when codefendant Denzmore realized the victim had been shot, codefendant Denzmore had asked the Defendant why he shot the victim and that the Defendant had responded that it had been an accident which occurred when the Defendant "went to hit [the victim] in the head, and the gun went off." Detective Frank said codefendant Denzmore stated that the Defendant had said he had gone through the victim's pockets "looking for something to get from him" but only found a lighter and a piece of paper.

Detective Frank testified that the Defendant had not been in custody at the time of the Defendant's interview. Detective Frank said that the Defendant was advised of his *Miranda* rights and that the Defendant signed a written waiver of those rights. Detective Frank said that the Defendant was not handcuffed and was free to leave and that the Defendant was not arrested at the end of the interview. Detective Frank said the Defendant agreed to provide a DNA sample. The *Miranda* waiver and the written waiver related to the DNA sample were received as exhibits. Detective Frank said that the Defendant was a high school graduate and "was getting ready to graduate [from] college." Detective Frank said he did not yell at the Defendant during the approximate one-hour interview. Detective Frank said the Defendant never asked to stop the interview, to consult with an attorney, or to leave.

Detective Frank testified that although the Defendant did not admit during the statement that he killed the victim, the Defendant admitted he had a .40-caliber gun and fired it in the air on the night of the victim's death. When asked about his having told the Defendant, "I want to help you out, but if you're not honest with me I can't help you out," Detective Frank said that he wanted the Defendant to be forthcoming and that Detective Frank would tell the district attorney "the basis of what happened out there" if the Defendant said the shooting had been an accident. Detective Frank said that based upon codefendant Denzmore's statement, Detective Frank thought at the time that the shooting had been accidental.

Detective Frank acknowledged that he falsely told the Defendant that a video recording of the shooting existed and that he used information from codefendants Sherrill

and Denzmore to create the false impression a video recording existed. Detective Frank said that the Defendant asked to see the recording and that Detective Frank falsely told the Defendant that he did not have the capability to play the recording in the interview room. Detective Frank said, however, that the Defendant "never based his statements off of me saying I had the video." Detective Frank said the Defendant never stated that he shot the victim but that it had been an accident. Detective Frank agreed that the Defendant admitted he had discarded the gun he had on the night of the shooting. Detective Frank acknowledged that he knew at the time of the Defendant's interview that the district attorney's office might charge felony murder in the case, as the occurrence of an accidental death was immaterial to the crime of felony murder. Detective Frank agreed that he asked the Defendant about facts that Detective Frank had learned in the interviews of codefendants Sherrill and Denzmore and that the Defendant did not admit involvement other than having been present and having shot a gun "in the air."

Detective Frank testified that he attempted to interview the Defendant a second time, after the Defendant had been arrested, but that the Defendant invoked his rights and did not agree to another interview.

The video recording of the interview was received as a defense exhibit. We have reviewed the recording, and it reflects the following regarding the question of whether the statement was knowingly and voluntarily given: The Defendant, Detective Frank, and another police officer spoke in a small room. Detective Frank advised the Defendant of his *Miranda* rights and told the Defendant he was not in custody or under arrest. The Defendant indicated his understanding and agreed to waive his rights and speak to the officers. The Defendant signed the written waiver of rights. The substance of the interview regarding the crimes was consistent with Detective Frank's testimony. Detective Frank made repeated claims about what he had seen on the purported video recording and suggested that the victim had been shot accidentally. Detective Frank also suggested that self-defense might have been involved. Detective Frank claimed that a neighbor had identified the Defendant. During the interview, the Defendant agreed to provide a DNA sample, and Detective Frank advised him of his rights regarding the collection of the sample. The Defendant signed the written waiver.

After receiving the evidence, the trial court filed a written order denying the motion to suppress. The court found that the Defendant was not in custody and was free to leave when the interview ended, that the Defendant did not appear to be under the influence of an intoxicant or otherwise impaired, and that the Defendant did not ask for an attorney or to end the interview. The court noted that the Defendant signed a waiver of his *Miranda* rights and consented to provide a DNA sample. Upon review of the totality of the circumstances, the court found that neither Detective Frank nor Detective Chouanard, the other officer present, made promises or offers to the Defendant and did not threaten or coerce the Defendant. The court found that the Defendant's will was not overborne such

that his statement was involuntary. The court also found that although Detective Frank made false statements about having a video recording of the incident, the information he represented he learned from the recording was based on interviews with codefendants Sherrill and Denzmore, and that it was insufficient to overbear the Defendant's will and to render the statement involuntary.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); s*ee also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. Art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *see State v. Northern*, 262 S.W.3d 741, 763 (Tenn. 2008). To be considered voluntary, a statement must not be the product of "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). A defendant's subjective perception is insufficient to establish the existence of an involuntary confession. *Id*. The essential inquiry is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined [.]" *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). A confession is involuntary if it is the product of coercive state action. *See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). "The State has the burden of proving the voluntariness of the confession by a preponderance of the evidence." *State v. Willis*, 496 S.W.3d 653, 695 (Tenn. 2016).

In determining whether a confession is voluntary, a trial court examines the totality of the circumstances, which encompasses "both the characteristics of the accused and the details of the interrogation." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Relevant circumstances include the following:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)).

On appeal, the Defendant argues that his admissions of having been present at the scene and having fired a gun were coerced by Detective Frank's false statements regarding the existence of a video recording and an eyewitness identification, false statements about what was shown on the alleged recording, statements that Detective Frank wanted to "help out" the Defendant but needed the Defendant to be honest, and statements that Detective Frank thought the shooting had been accidental. The State responds that the record supports the trial court's denial of the motion to suppress the Defendant's statement.

The record reflects that the trial court considered the totality of the circumstances in ruling on the motion to suppress. To that end, the record reflects that the Defendant was a high school graduate with additional education, that the interview was slightly less than one hour long, that the Defendant was not in custody and appeared voluntarily for the interview, that he showed no signs of impairment or distress during the interview, that the interview was conversational and did not involve threats. The Defendant was advised of his *Miranda* rights, and he signed a written waiver. Detective Frank told the Defendant that he was not in custody or under arrest, and Detective Frank testified that the Defendant was not arrested at the end of the interview. Later during the interview, the Defendant agreed to provide a DNA sample and signed the waiver for collection of the sample. Throughout the interview, the Defendant never tried to end the questioning, nor did he ever ask for an attorney.

This court has said that misrepresentations and promises of leniency may render a statement involuntary. *State v. Phillips*, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (affirming the trial court's suppression of a defendant's inculpatory statement obtained after misrepresentations by a Department of Children's Services investigator, the defendant's repeated denials of wrongdoing, statements by the investigator that law enforcement would become involved unless the defendant confessed, and promises of specific treatment conditioned upon the defendant's full confession). In the present case, the trial court found that the facts did not show that the Defendant's will had been overborne by Detective Frank's misrepresentations and statements he might "help out" the Defendant by presenting any mitigating facts, such as that the shooting had been accidental, to the district attorney. Although Detective Frank falsely told the Defendant that a video recording existed and that an eyewitness had identified the Defendant, Detective Frank's false representations about what he had learned from viewing the purported recording were based upon factual information gathered in the interviews of codefendants Sherrill and Denzmore. The trial court concluded that the State showed by a preponderance of the evidence that the Defendant's statement had been voluntarily given, and the record supports the court's determination.

The trial court did not err in denying the motion to suppress. The Defendant is not entitled to relief on this basis.

## IV

## Chain of Custody

The Defendant contends that the trial court erred in admitting the DNA evidence from the victim's pants because the State failed to establish an unbroken chain of custody for the pants. He argues that the State failed to show how the pants were transported from the MNPD's evidence room to the TBI Laboratory. The State counters that it presented sufficient proof to authenticate the evidence.

Tennessee Rule of Evidence 901 states that evidence must be authenticated in order to be admissible. Evidence is authenticated by providing proof "sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence," it should be admitted. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008). In order to prove the reliability of tangible evidence, the State must prove "an unbroken chain of custody." *Scott*, 33 S.W.3d at 760 (internal citation omitted). Relative to the State's burden in proving the chain of custody, our supreme court has said:

Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond the possibility of all doubt; nor should the State be required to establish facts which exclude every possibility of tampering . . . . An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item . . . . [If] the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen, et al., *Tennessee Law of Evidence* § 901.12, at 624 (3rd ed. 1995)).

*Cannon*, 254 S.W.3d at 296. This court reviews chain of custody determinations for an abuse of discretion. *Id.* at 295.

At the trial, witnesses were called out of order due to scheduling issues, and the victim's pants and evidence about the DNA testing related to the pants were introduced before the chain of custody had been fully explored. We will recount the relevant evidence and objections in the order in which they were received at the trial.

MNPD Crime Laboratory employee Ms. Dradt testified that all evidence collected for a case was labeled with a bar code and central complaint number, after which the evidence was taken to the "property room," which was the location "where all the evidence is stored." She said the property room was in a secured building that was "locked down."

Medical Examiner Dr. Li testified that the victim's body was clothed in pants when the body was received for the autopsy on August 6, 2015. The autopsy report states that the body had been transported from the scene to the Center for Forensic Medicine for the autopsy. Dr. Li stated that the usual practice was for either himself or an assistant to remove clothing from a body, dry and pack the clothing, and "submit it for evidence." He said the police typically picked up the clothing. When asked whether he knew if the clothing was picked up by police in this case, he said his report did not reflect whether it was, but he said, "I am sure this is standard procedure." He said that his office kept records regarding the release of evidence to the police and that a technician typically released evidence to the police.

MNPD Crime Laboratory employee Ms. Ellis testified that Detective Frank submitted requests for DNA testing of the victim's pants on August 4 and 18, 2015. Before Ms. Ellis was asked to identify the pants, the prosecutor addressed defense counsel: "Mr. Hakes, this would have actually been introduced through Mr. Frank, but if you have no objection, I'll do it now." Defense counsel responded, "There's no objection." The record reflects that Detective Frank had not yet testified. Ms. Ellis identified the pants, which were packaged in a bag with evidence tape and which contained her initials. The pants

were received as an exhibit. When asked if she had been the person who received the pants when they entered the laboratory, Ms. Ellis stated that she had not been but that she understood the procedure to be the following: "[O]nce a request is approved, the evidence is then asked to be brought over from a property and evidence room to our crime lab, and it is accepted into the evidence receiving unit. They then put unique identifiers on there for us to know which case it goes with." When asked if documentation would show "where the pants would've been for each time they moved," she responded, "Yes." During her testimony, Ms. Ellis identified her forensic biology report, which was received as an exhibit. The document was addressed to Detective Frank as the "submitting officer" and listed several items received and analyzed by the laboratory, including the victim's pants.

After other witnesses testified about DNA analysis evidence related to the victim's pants, defense counsel moved to strike the evidence and provided the following explanation:

> [W]e've heard that the pants moved in this way. They went from [the victim] right on his body to the [Medical Examiner]'s Office. [Dr]. Feng Li testified that they were removed at the M.E.'s Office. From there, we do not know who picked them up and how they got to the crime lab. The chain is broken. We don't know anything about how the first analyst, Ms. Julie Ellis, obtained those pants from the . . . Evidence Receiving Unit.

The prosecutor responded that a written record existed "that the defense has had for a long time" which showed that Detective Frank picked up the pants from the medical examiner's office. The prosecutor said he thought Detective Frank "can make that chain" in his upcoming testimony. The prosecutor said that he understood the pants had been taken from the property room to the MNPD Crime Laboratory and that "if we needed to track down who that person is who gets it from the property room to the crime lab, we can try to do that." The prosecutor noted, however, that the defense had "known about this and [had] not raised it." The trial court noted that witnesses had been called out of order and denied the objection, noting, "[I]f we need to bring somebody in from the property room or the certified records from the property room, we will do so."

Thereafter, Detective Frank testified that he picked up the victim's clothing from the medical examiner's office on August 12, 2015. He identified the transfer receipt showing that he took possession of the victim's property, including a pair of khaki pants. He acknowledged his signature on the transfer receipt. He said that when he received evidence from the medical examiner, he created a MNPD Property Sheet and "log[ged] it into [the] property room where it's kept for safe storage." He agreed that after he picked up the evidence in the present case, he labeled it and took it to the property room. He said the evidence was in his possession while he completed these tasks. At the conclusion of Detective Frank's direct examination, the court inquired whether the prosecutor wanted to

-38-

introduce as exhibits "some documents" the prosecutor had shown to Detective Frank. The prosecutor stated, "Unless there would be any chain of custody objections, I don't see a need to do that," to which defense counsel responded, "No. I thought you were going to ask him about the transcript [of the Defendant's pretrial statement]." The court said, "No. No. I'm asking about the ones he showed from the M.E.'s Office, the ones that Dr. Li referred to and he signed." One of the defense attorneys stated, "That's fine." The prosecutor mentioned the "swabs," and one of the defense attorneys said, "That's fine." The same defense attorney then stated that the only issue was with the transcript of the Defendant's interview and that the defense did not "want that to go back with the jury." The court assured defense counsel that the transcript would not be provided to the jury during deliberations and said, "I was interested [if there] is . . . still an objection to the chain of custody such that that needs to be put into evidence?" One of the defense attorneys responded, "I don't think so."

The defense next raised the issue in the motion for a new trial, in which it alleged that the trial court erred in denying the "Motion to Withdraw [the Victim's] Pants as an Exhibit." At the hearing on the motion, the defense did not offer argument. The prosecutor stated that the defense had received a "receipt from the medical examiner" showing that Detective Frank had picked up the victim's pants from the medical examiner, and the receipt was received as a hearing exhibit. In denying the motion for a new trial, the court found that the chain of custody had been properly established "through the evidence provided in discovery and the witness testimony of Detective Frank, Dr. Feng Li, Julie Ellis, and Benjamin DeBlanc."

The record reflects that the State offered a combination of evidence directly related to the transfer of the victim's pants from one custodial entity to another as well as standard practices evidence regarding the receipt and transfer of evidence from the medical examiner's office, the MNPD Crime Laboratory, and Detective Frank. Although the State did not offer evidence which directly addressed the transfer of the pants from the evidence room to the Crime Laboratory, (1) Dr. Li testified about the standard procedures for collecting, packaging, storing, and releasing the evidence to the police; (2) Detective Frank testified about his procedure for receiving evidence from the medical examiner, documenting it, and "logging" it in to the property room; (3) Ms. Ellis testified about the general practice of the evidence remaining secured in the property room and being brought to the crime laboratory once a testing request was approved; (4) Ms. Ellis's report listed Detective Frank as the "submitting officer" for evidentiary items, including the victim's pants; and (5) Ms. Ellis also testified that documentation was created to record the transfer of evidence from one place to another. No evidence at the trial suggested any deviation from these procedures or any irregularity with the integrity of the evidence. The defense raised a challenge to the chain of custody at the trial, and the prosecutor and the court stated that an additional witness could be called if necessary. After further evidence was received from Detective Frank, however, the defense indicated it had no further objections to the

-39-

chain of custody issue. The State cannot be faulted for not calling an additional witness regarding the transfer of the victim's pants between the medical examiner's office and the crime laboratory, given the circumstances. In any event, Detective Frank's and Ms. Ellis's testimony adequately explained the process. When the defense resurrected the chain-of-custody issue at the motion for a new trial, the trial court concluded that the State had reasonably authenticated the evidence by proving an adequate chain of custody. The record supports the court's determination. The trial court did not abuse its discretion in admitting and later refusing to strike the evidence. The Defendant is not entitled to relief on this basis.

# V

## Consecutive Sentencing

In this final issue, the Defendant contends that the trial court abused its discretion in imposing partially consecutive sentences. The record reflects that the Defendant's sentences consisted of the following: a life sentence for first degree felony murder, with which the second degree murder and its attendant twenty-five-year sentence had been merged; twenty-one-year sentences for each of two counts of attempted first degree murder followed by six years for each of his two convictions for employment of a firearm in the commission of a dangerous felony, as required by law, with the effective twenty-seven-year sentences for attempted first degree murder and the firearms offenses to be served consecutively to the life sentence; and ten years for attempted aggravated robbery, to be served concurrently to the first degree felony murder conviction. The Defendant acknowledges that the firearms offenses were statutorily required to be imposed with consecutive service to the attendant attempted first degree murder offenses, but he challenges the imposition of consecutive service for the effective twenty-seven-year sentences for attempted first degree murder and the firearms offenses sentences with the life sentence.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the trial court received as an exhibit the transcript of the January 23, 2019 bond revocation hearing, at which the trial court revoked the Defendant's bond for the present offenses for several days and imposed additional conditions upon rerelease. The court made its determination after receiving evidence that the Defendant, who did not have a driver's license, had been stopped for speeding and had been charged with unlawful weapon possession, possession of drug paraphernalia, and misdemeanor marijuana possession. The evidence at the hearing also showed that the Defendant had a positive drug screen for marijuana and that he admitted using both marijuana and Lortab, the latter of which he obtained from a family member. The transcript of a bond reduction hearing was also received as an exhibit at the sentencing hearing, but it has not been included in the appellate record.

The presentence report was received as an exhibit and reflected that the Defendant was twenty-three years old at the time of sentencing, had one child, had completed high school, and had been enrolled in technical schooling until his arrest in the present case. The Defendant reported that he began smoking four to five marijuana "blunts" per day at age twelve and that he had used marijuana until his incarceration in the present case. His employment history included furniture assembly and food service. He had no prior criminal convictions. The Strong-R Risk Assessment attached to the presentence report reflected that the Defendant was at moderate risk of reoffending.

The Defendant's mother testified that the Defendant had had a minor juvenile charge but that it had been "nothing." She said the Defendant was a hard worker and had begun full-time employment upon high school graduation. She said the Defendant was an excellent father to his daughter. She said the Defendant had obtained a student loan in order to attend technical school to learn to be a mechanic and that he had been a good student. She identified photographs of the Defendant and some of his family members, which were received as exhibits.

In an allocution, the Defendant stated: He was sorry for having been "around activity that may have lead [sic] to [the victim's] death" and for having caused stress to his family. He said he was sorry he had gone from being a hard worker with a "clean record" to a criminal defendant because he "chose to be around" a family member and a friend. He said he planned to use his time in prison to attend programs that would help him be a better human being and that he would like to be an advocate to steer others from criminal activity.

After receiving the evidence, the trial court found enhancement factors based upon the Defendant's prior history of criminal convictions or criminal behavior, his having been a leader in the offenses involving two or more criminal actors, and the particular vulnerability of the child victims. *See* T.C.A. § 40-35-114(1), (3), (4) (2019). The court applied these factors to the convictions for attempted first degree murder and attempted especially aggravated robbery. The court did not apply any mitigating factors. *See id.* § 40-35-113 (2019). The court found that the Defendant was a dangerous offender whose behavior indicated little to no regard for human life and that partial consecutive sentencing reasonably related to the seriousness of the offenses and was necessary to protect the public from further criminal conduct committed by the Defendant. *See id.* § 40-35-115(b)(4) (2019). In making this finding, the court noted the facts of the offense included the victim's having said he did not have "anything" and having nevertheless been shot in the head, the Defendant's having rifled through the victim's pockets, the shooting into the bedroom where two children slept, and the Defendant's subsequent gun possession in the events which led to the bond revocation.

On appeal, the Defendant does not challenge the court's application of enhancement factors or its decision not to apply any mitigating factors. He focuses solely on the trial court's imposition of consecutive sentencing based upon its finding that he was a dangerous offender. He argues that proof he committed multiple dangerous crimes, standing alone, is insufficient to support a dangerous offender finding. He argues, as well, that a sentence of life plus twenty-seven years is greater than the sentence deserved for the crimes and is not the least severe measure necessary to achieve the purposes for which the sentence is imposed.

In order to impose consecutive sentences on the basis that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," a trial court must also find that the sentences "are reasonably related to the severity of the offenses" and "are necessary in order to protect the public from further criminal acts" by the defendant. *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996).

The record reflects that the trial court made the appropriate *Wilkerson* findings to support its determination that the Defendant was a dangerous offender. The evidence shows that Defendant and his codefendants went to the scene armed, that they decided to rob the victim after they were unable to contact Mr. Mitchell, that the victim protested that he did not have anything, that the Defendant nevertheless shot the victim, that the Defendant searched the victim's pockets for money while codefendant Denzmore shot into the nearby duplex when he saw a light turn on, and that the Defendant and codefendant Denzmore discarded their guns as they fled the scene. While on bond for these offenses, the Defendant was arrested for new offenses, including possession of a handgun. We conclude that the trial court did not abuse its discretion in determining that the Defendant was a dangerous offender and that the effective sentence was appropriate for the offenses and to protect the public from the Defendant's future criminal conduct. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE